**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OMAR MOORE, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Plaintiff*, | ) | |
| | ) | Case No. |
| *v.* | ) | |
| | ) | |
| CITY OF CHICAGO, DETECTIVE | ) | |
| PAULETTE WRIGHT, STAR NO. | ) | |
| 21243, DETECTIVE TIMOTHY | ) | |
| CERVEN, STAR NO. 20971, | ) | |
| DETECTIVE PURTELL, STAR NO. | ) | |
| 20693, DETECTIVE NATHANIEL, | ) | |
| STAR NO. 20443, DETECTIVE | ) | |
| FLAGG, STAR NO. 20041, OFFICER | ) | |
| SANDERS, STAR NO. 9389, | ) | |
| OFFICER PATTERSON, STAR NO. | | |
| 3606, and UNKNOWN EMPLOYEES OF | | |
| THE CITY OF CHICAGO, | | |

*Defendants.*

## COMPLAINT

NOW COMES Plaintiff, OMAR MOORE, by his attorneys LOEVY &
LOEVY, and complaining of Defendants DETECTIVE PAULETTE WRIGHT,
STAR NO. 21243, DETECTIVE TIMOTHY CERVEN, STAR NO. 20971,
DETECTIVE PURTELL, STAR NO. 20693, DETECTIVE NATHANIEL, STAR NO.
20443, DETECTIVE FLAGG, STAR NO. 20041, OFFICER SANDERS, STAR NO.
9389, OFFICER PATTERSON, STAR NO. 3606, UNKNOWN EMPLOYEES OF THE
CITY OF CHICAGO (collectively, "Defendant Police Officers"), and
the CITY OF CHICAGO, Illinois, states as follows:

## INTRODUCTION

1.     Omar Moore lost almost a decade of his life as a result
of being wrongfully convicted of murder.

2.    Mr. Moore's wrongful conviction was no accident. The Defendant Police Officers framed Mr. Moore by coercing three men to falsely implicate him, all the while knowing that Mr. Moore was innocent of this crime.

3.    Mr. Moore never stopped fighting the false charges and eventually was exonerated.

4.    Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

**JURISDICTION AND VENUE**

5.    This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

6.    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

7.    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many, if not all, of the Defendants reside in this judicial district.

**PARTIES**

8.    Plaintiff Omar Moore spent approximately 10 years wrongly incarcerated based on a conviction for a murder that he did not commit.

9.    At all times relevant to the events described in this Complaint, Defendants Wright, Cerven, Purtell, Nathaniel, Flagg, Sanders, Patterson, and other unknown law enforcement officers were police officers in the Chicago Police Department.

10.    The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Martin murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

11.    Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

**THE CRIME**

12.    On January 14, 2007, victim Wilbur Martin and his friend Henry Johnson were scavenging metal to sell at a junkyard.

13.    The junkyard was located at 59th and Shields Avenue on the South Side of Chicago.

14.    Both Martin and Johnson were addicted to narcotics and intended to use the money they obtained from the sale of the scrap metal to purchase drugs.

15.    Both men walked south from 54th and Shields Avenue with their scavenged metal in a garbage can.

16.    When Martin and Johnson reached 57th and Shields Avenue, a drug dealer from that area accused Martin and Johnson of coming to his neighborhood to collect money, but not staying to purchase narcotics from the people in that neighborhood.

17.    A physical confrontation ensued; Martin was chased, taken to the ground, and beaten severely. At least one offender beat Martin with a metal pole.

18.    Martin was hospitalized and eventually died from wounds sustained during the beating.

19.    Johnson was also injured during the melee.

20.    Mr. Moore was not present for Martin's beating and had nothing to do with the murder whatsoever. Mr. Moore did not live in the neighborhood where the murder occurred, did not sell drugs in the area where the murder occurred, and had no motive whatsoever to attack or kill Martin.

21.    Nevertheless, the police officer Defendants were determined to frame Mr. Moore for Martin's murder.

**DEFENDANTS MANIPULATE JOHNSON**

22.    Defendants Wright and Cerven initially interviewed Johnson while he was still in the hospital.

23.   Defendants Wright and Cerven lied to Johnson by falsely claiming that he had previously accused Mr. Moore of being the person who beat Martin.

24.   Johnson truthfully told Defendants that he knew Mr. Moore, Mr. Moore was not present during the attack, and that he had not claimed that Mr. Moore was the perpetrator.

25.   Nevertheless, Defendants Wright and Cerven coerced Johnson to implicate Mr. Moore by threatening to falsely incarcerate him unless he helped frame Mr. Moore.

26.   Defendants Wright and Cerven also paid Johnson on numerous occasions to point the finger at Mr. Moore, but purposely withheld evidence that those payments were made from both the prosecutors and Mr. Moore's criminal defense team.

27.   Subsequently, Defendants Purtell, Nathaniel, and Flagg falsely claimed that Johnson had identified Mr. Moore from a line-up as the person who had beaten Martin. Johnson never identified Mr. Moore from a live line-up as the person who had beaten Martin.

28.   Defendants Purtell, Nathaniel, and Flagg falsely claimed that Johnson had implicated Mr. Moore despite their knowledge that Mr. Moore had nothing to do with the crime.

29.   A witness, Betty Robinson, observed the beating and described the person who struck Martin with the metal pole.

30.   Robinson viewed a photo array presented by Defendants Wright and Cerven, which included Mr. Moore's photograph, and

stated that none of the people in the photo array, including Mr. Moore, were involved in the crime.

31.    Defendants Wright and Cerven, however, falsely claimed that Robinson said Mr. Moore's photograph best resembled the man with the metal pole, in order to diminish the exculpatory value of Robinson's testimony that Mr. Moore did not commit the murder.

**DEFENDANTS COERCE DELANEY TO FALSELY ACCUSE MR. MOORE**

32.    In addition, Defendants Sanders and Patterson arrested Robert Delaney without legal justification in order to coerce him to also falsely implicate Mr. Moore.

33.    Delaney was present at the scene of Martin's attack and knew that Mr. Moore had nothing to do with that crime.

34.    Defendants Sanders and Patterson transported Delaney to Area 1 Detective Headquarters, where Defendants Wright and Cerven took over Delaney's questioning.

35.    At Area 1, Defendants Wright and Cerven forced Delaney to falsely implicate Mr. Moore or else he would be incarcerated. Defendants Wright and Cerven communicated to Delaney that if he accused Mr. Moore, he could go free.

**DEFENDANTS FEED A FALSE STORY TO ELLIOT**

36.    Defendants Wright and Cerven also coerced Clifton Elliot to falsely say that Mr. Moore attacked Martin.

37.    Elliot truthfully told Defendants Wright and Cerven that he had no knowledge of Mr. Moore having anything to do with Martin's death.

38. Nevertheless, Defendants Wright and Cerven threatened Elliot repeatedly until he finally falsely implicated Mr. Moore.

39. In order to make their false story appear more plausible, Defendants Wright and Cerven fed Elliot information about the murder, despite knowing that Mr. Moore was innocent.

40. At no time did anyone voluntarily or reliably implicate Mr. Moore in Martin's murder or the attack on Johnson in any way.

## MR. MOORE'S TRIAL AND CONVICTION

41. Mr. Moore, in fact, was entirely innocent of the crime.

42. No physical evidence ever connected Mr. Moore in any way to the crime.

43. Solely on the basis of the false evidence manufactured by the Defendants, Mr. Moore was wrongly convicted of murder and incarcerated in the Illinois Department of Corrections.

44. Absent Defendants' misconduct, Mr. Moore would never have been charged with a crime, let alone wrongly convicted.

## MR. MOORE'S EXONERATION

45. Mr. Moore never stopped trying to prove his innocence.

46. In post-conviction proceedings, Mr. Moore presented evidence that the only three witnesses who accused him at trial – Johnson, Delaney, and Elliot – all recanted their identifications of him and testified that their false testimony had been procured by the Defendant Police Officers.

47. Mr. Moore also presented evidence from other witnesses that he was not the perpetrator.

48.    Upon hearing this evidence, the Circuit Court of Cook County vacated his conviction.

49.    Realizing there was no credible evidence implicating Mr. Moore in the crime, prosecutors then dismissed all charges against him.

50.    Mr. Moore was finally freed, but at that point his whole life had been turned upside down.

51.    Because of the Defendants' misconduct, Mr. Moore was taken away from, and missed out on, the lives of his family and his friends. His son passed away while he was incarcerated and he was not allowed to attend his funeral. He returned home to relationships changed or lost by almost a decade of wrongful incarceration.

52.    Mr. Moore was robbed of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

53.    During his 10 years of wrongful imprisonment, Mr. Moore was detained in harsh and dangerous conditions in prisons throughout Illinois.

54.    Mr. Moore lived in constant emotional anguish never knowing whether the truth would come out and whether he would ever be exonerated.

55.    In addition to the severe trauma of wrongful imprisonment and Mr. Moore's loss of liberty, the Defendants' misconduct continues to cause Plaintiff physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, and other physical and psychological effects. Plaintiff has been falsely branded a murderer. He has suffered profound reputational harm as a result.

**Policy and Practice of Wrongly Convicting**
**Innocent People In Violation of Due Process**

56.    The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

57.    Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

58.    These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false inculpatory statements; (2) fabricating witness statements; (3) fabricating witness identifications; (4) concealing exculpatory evidence; (5) manipulating witnesses in order to influence their testimony; and (6) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

59.   At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department Officers routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, Chicago Police Department Officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

60.   The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together

to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

61.  At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the Police Department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

62.  Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

63.  The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Fields v. City of Chicago*, 10 C1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536, 88 Civ. 1127 (N.D. Ill.).

64.  The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Martin murder and investigation at issue here.

65.    In addition, a set of clandestine street files related to homicides was found in the case of *Rivera v. City of Chicago*, 12 Civ. 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

66.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Martin murder, including in the Area 1 Detective Division.

67.    The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

68.    Prior to and during the period in which Plaintiff was falsely charged and convicted with the Martin murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

69.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and

otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

70. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, and failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

71. The City of Chicago and the Chicago Police Department also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a. The conduct of live and photographic lineup procedures.

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

13

c.   The need to refrain from physical and psychological
     abuse, and manipulative and coercive conduct, in
     relation to suspects and witnesses.

d.   The risks of wrongful conviction and the steps police
     officers should take to minimize these risks.

e.   The risks of engaging in tunnel vision during
     investigation.

f.   The need for full disclosure, candor, and openness on
     the part of all officers who participate in the police
     disciplinary process, both as witnesses and as accused
     officers, and the need to report misconduct committed
     by fellow officers.

72.   The need for police officers to be trained in these
areas was and remains obvious. The City's failure to train
Chicago Police Officers as alleged in the preceding paragraph
caused Plaintiff's wrongful conviction and his injuries.

73.   The City's failure to train, supervise, and discipline
its officers, including the Defendant Police Officers, condones,
ratifies, and sanctions the kind of misconduct that the
Defendants committed against Plaintiff in this case.
Constitutional violations such as those that occurred in this
case are encouraged and facilitated as a result of the City's
practices and *de facto* polices, as alleged above.

74.   The City of Chicago and final policymaking officials
within the Chicago Police Department failed to act to remedy the
patterns of abuse described in the preceding paragraphs, despite
actual knowledge of the pattern of misconduct. They thereby

14

perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

75. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**COUNT I – 42 U.S.C. § 1983**
**Due Process**
**(Fourteenth Amendment)**

76. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

77. In the manner described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

78. In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

79. The Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

80. In addition, the Defendants suppressed evidence that would have demonstrated Plaintiff's innocence.

81. In addition, based upon information and belief, the Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

82. The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

83. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

84. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

85. The Defendants' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II – 42 U.S.C. § 1983
### Deprivation of Liberty and Detention Without Probable Cause
### (Fourth and Fourteenth Amendments)

86. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

16

87.    In the manner described more fully above, the
Defendants, acting individually, jointly, and in conspiracy with
one another, as well as under color of law and within the scope
of their employment, used false evidence that they had
manufactured in order to accuse Plaintiff of criminal activity
and to cause the detention of Plaintiff, without probable cause.

88.    In so doing, these Defendants caused Plaintiff to be
deprived of his liberty and detained without probable cause, in
violation of his rights secured by the Fourth and Fourteenth
Amendments.

89.    The misconduct described in this Count was objectively
unreasonable and was undertaken intentionally, and in total
disregard of the truth and Plaintiff's clear innocence.

90.    As a result of the misconduct of the Defendants
described in this Count, Plaintiff suffered loss of liberty,
great mental anguish, humiliation, degradation, emotional pain
and suffering, and other grievous and continuing injuries and
damages.

91.    The Defendants' misconduct described in this Count was
undertaken pursuant to the policy and practice of the Chicago
Police Department, in the manner more fully described below in
Count V.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

92.    Plaintiff incorporates each paragraph of this Complaint
as if fully restated here.

93.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

94.     As result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. The Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

95.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

96.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

97.     The Defendants' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

98.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

99.     The Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

100.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

101.     In furtherance of this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

102.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

103.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

104.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT V – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

105.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

106.  As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

107.  Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policymaking officials for the City of Chicago.

108.  At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

109.  These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

110.  In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

111.  Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at

21

length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

112. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

113. These widespread practices, individually and/or together, were allowed to flourish because the leaders,

supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

114. The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115. As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

116. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

117. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants,

who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VI – State Law Claim
### Malicious Prosecution

118. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

119. In the manner described above, the Defendants, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of murder, and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff for that crime, without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

120. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

121. The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

122. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

123. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain

and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

124.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

125.  The actions, omissions, and conduct of the Defendants, acting as investigators and as set forth above, were extreme and outrageous.

126.  These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

127.  As a result of the Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages set forth above.

### COUNT VIII – State Law Claim
### Civil Conspiracy

128.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129.  As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves

to protect one another from liability for depriving Plaintiff of these rights.

130.  The violations of Illinois law described in this complaint, including the Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

131.  The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

132.  As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

## COUNT IX – State Law Claim
### *Respondeat Superior*

133.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

134.  In committing the acts alleged in the preceding paragraphs, the Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

135.  Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT X – State Law Claim
### Indemnification

136.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

137. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

138. The Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

139. The City is liable to indemnify any compensatory judgment awarded against the Defendants.

WHEREFORE, Plaintiff OMAR MOORE, respectfully requests that this Court enter a judgment in his favor and against Defendants DETECTIVE PAULETTE WRIGHT, DETECTIVE TIMOTHY CERVEN, DETECTIVE PURTELL, DETECTIVE NATHANIEL, DETECTIVE FLAGG, OFFICER SANDERS, OFFICER PATTERSON, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, OMAR MOORE, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**OMAR MOORE**

BY: /s/ Russell Ainsworth
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 789-4968
russell@loevy.com